1  JOSEPH T. MCNALLY
   Acting United States Attorney
2  LINDSEY GREER DOTSON
   Assistant United States Attorney
3  Chief, Criminal Division
   ADAM P. SCHLEIFER (Cal. Bar No. 313818)
4  KEVIN B. REIDY (Cal. Bar No. 320583)
   Assistant United States Attorneys
5  Corporate and Securities Fraud Strike Force/Major Frauds Section
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-4849/8536
        Facsimile: (213) 894-6269
8       E-mail:   adam.schleifer@usdoj.gov; kevin.reidy@usdoj.gov

9  Attorneys for Plaintiff
   UNITED STATES OF AMERICA
10
                     UNITED STATES DISTRICT COURT
11
                FOR THE CENTRAL DISTRICT OF CALIFORNIA
12
   UNITED STATES OF AMERICA,          No. 2:24-cr-295-RGK
13
              Plaintiff,              GOVERNMENT'S MOTION FOR ORDER
14                                    PERMITTING REVIEW OF NONPRIVILEGED
                   v.                 DOCUMENTS AND FOR ORDER DIRECTING
15                                    ATTORNEY COMMUNICATIONS BE
   ANDREW A. WIEDERHORN              SUBMITTED FOR *IN CAMERA* REVIEW;
16 WILLIAM J. AMON,                   DECLARATION OF ADAM P. SCHLEIFER;
   REBECCA D. HERSHINGER, and         EXHIBITS
17 FAT BRANDS INC.,

18            Defendants.

19

20       Plaintiff United States of America, by and through its counsel

21 of record, the Acting United States Attorney for the Central District

22 of California and Assistant United States Attorneys Adam P. Schleifer

23 and Kevin B, Reidy, hereby files its Motion for an Order Permitting

24 Review of Nonprivileged Documents or, alternatively, for an order

25 directing in-camera review of certain communications made by counsel

26 to defendant Fat Brands Inc.

27       This Motion is based upon the attached memorandum of points and

28 authorities, the attached Declaration of Adam P. Schleifer and the

exhibits thereto, the files and records in this case, and such

further evidence and argument as the Court may permit.

Dated: March 7, 2025          Respectfully submitted,

                              JOSEPH T. MCNALLY
                              Acting United States Attorney

                              LINDSEY GREER DOTSON
                              Assistant United States Attorney
                              Chief, Criminal Division

                              *APS*
                              _____
                              ADAM P. SCHLEIFER
                              KEVIN B. REIDY
                              Assistant United States Attorneys

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

**Contents**

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   STATEMENT OF RELEVANT FACTS AND IDENTIFIED COMMUNICATIONS......3

      A.   Sussman's March 12, 2020, Email to Outside Auditors.......4

      B.   Sussman's April 24, 2020, Emailed Memo....................5

      C.   Sussman's Communications Furthered Schemes................6

III.  Argument........................................................6

      A.   Legal Standards...........................................6

           1.   Attorney-Client Privilege............................6

           2.   Work-Product Doctrine................................7

           3.   Crime-Fraud Exception................................8

           4.   *Zolin* Process......................................8

      B.   Sussman's Email to Outside Auditors Was Never
           Privileged................................................9

      C.   Any Privilege Over Sussman's Email Was Waived............10

      D.   The Government Has Satisfied Zolin's First Step.........11

IV.   CONCLUSION.....................................................13

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                <u>PAGE</u>

**<u>CASES</u>**

<u>Eastman v. Thompson</u>,
      594 F. Supp. 3d 1156 (C.D. Cal. 2022)................2, 7, 9–10

<u>First Horizon Nat'l Corp. v. Houston Cas. Co.</u>,
      2016 WL 5867268, at *10 (W.D. Tenn. Oct. 5, 2016)............10

<u>In re Grand Jury Investigation</u>,
      810 F.3d 1110 (9th Cir. 2016)................................2,

<u>In Re Grand Jury Proceedings</u>,
      867 F.2d 539 (9th Cir. 1989)..................................8

<u>In re Grand Jury Proceedings</u>,
      87 F.3d 377 (9th Cir. 1996)...................................8

<u>Medinol, Ltd. v. Boston Sci. Corp.</u>,
      214 F.R.D. 113 (S.D.N.Y. 2002)............................2, 11

<u>Middlesex Ret. Sys. v. Quest Software, Inc.</u>,
      2009 WL 10673943, at *6   (C.D. Cal. July 8, 2009)............2

<u>Santander Holdings USA, Inc. & Subsidiaries v. United States</u>,
      2012 WL 3218535, at *1 (D. Mass. Aug. 6, 2012)................9

<u>United States v. Adlman</u>,
      134 F.3d 1194 (2d Cir. 1998)..................................2

<u>United States v. Arthur Young & Co.</u>,
      465 U.S. 805 (1984).........................................11

<u>United States v. Christensen</u>,
      828 F.3d 763 (9th Cir. 2015).................3, 6, 7, 8, 9

<u>United States v. Friedman</u>,
      445 F.2d 1076 (9th Cir. 1971).................................8

<u>United States v. Hatfield</u>,
      2010 WL 183522, at *3 (E.D.N.Y. Jan. 8, 2010)...............11

<u>United States v. Nobles</u>,
      422 U.S. 225 (1975)..........................................7

<u>United States v. Ruehle</u>,
      583 F.3d 600 (9th Cir. 2009)..........................2, 6, 10

<u>United States v. Sanmina Corp.</u>,
      968 F.3d 1107 (9th Cir. 2020)...........................11 n.7

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Textron Inc. & Subsidiaries,
    577 F.3d 21 (1st Cir. 2009)...................................2, 9

United States v. Zolin,
    491 U.S. 554 (1989).......................................passim

**STATUTES**

15 U.S.C. § 78m.............................................5 n.5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Through lies and material omissions to board members, auditors, minority shareholders, the Securities and Exchange Commission ("SEC"), and the broader investing public, defendant Andrew A. Wiederhorn ("Wiederhorn") caused defendant FAT Brands Inc. ("FAT") to give him $47 million in undisclosed compensation, which Wiederhorn and his codefendants fraudulently categorized as loans from both FAT and its affiliate, Fog Cutter Capital Group Inc. ("FOG"), and upon which Wiederhorn paid no income tax.  (See, e.g., Dkt. No. 1 ("Indictment") ¶¶ 1-2.)

When FAT's outside auditors grew concerned and requested "more details" from FAT's counsel, Allen Sussman, "to support" the fraudulent representations that the funds flowing to Wiederhorn were permissible and that "the loans" from FAT to FOG were not flowing to Wiederhorn "personally," Wiederhorn emailed Sussman, who then emailed FAT's outside auditors the "support" they'd requested.  (Schleifer Decl. Exs. A and B. ("Sussman's Email").)  Some six weeks later, Sussman emailed an additional "Memo to [the] FAT Board," about "the Intercompany Loan" between FAT and FOG ("Sussman's Memo") to which Wiederhorn adverted when he sent a materially misleading "supplement" to that email to FAT's Board.

Sussman's communications turned out to be critical in mollifying FAT's board and its outside auditors, and ultimately permitted Wiederhorn to siphon another $8 million from FAT's coffers. (Schleifer Decl. Ex. C.; see also Indictment ¶¶ 95-102, 128, 130, 132, 134.)  FAT has improperly asserted privileges over both of these critical documents.

1    Because Sussman's Email was prepared not for any litigative

2    purpose but instead to "support financial filings and gain auditor

3    approval," Sussman's Email was never privileged in the first place.

4    United States v. Textron Inc. & Subsidiaries, 577 F.3d 21, 31-32 (1st

5    Cir. 2009); United States v. Adlman, 134 F.3d 1194, 1203-04 (2d Cir.

6    1998); see also Eastman v. Thompson, 594 F. Supp. 3d 1156, 1182-84

7    (C.D. Cal. 2022) (ordering production of documents that "were not

8    made in anticipation of litigation"); cf. United States v. Ruehle,

9    583 F.3d 600, 609-13 (9th Cir. 2009) (CFO's statements to attorneys

10   failed the "made in confidence" test for attorney-client privilege

11   when made for "the purpose of disclosure to the outside auditors").

12   Even were Sussman's Email privileged attorney work product[1] when

13   created, however, Sussman's decision to send it to FAT's outside

14   auditor waived any such privilege.  Middlesex Ret. Sys. v. Quest

15   Software, Inc., 2009 WL 10673943, at *6 (C.D. Cal. July 8, 2009); see

16   also, e.g., Medinol, Ltd. v. Boston Sci. Corp., 214 F.R.D. 113, 115-

17   17 (S.D.N.Y. 2002).

18   For all of these reasons, the government requests an order from

19   this Court permitting the government to review Sussman's Email and

20   related work product and communications on the same subject matter.

21   Alternatively, even were Sussman's Email and Sussman's Memo

22   otherwise privileged, any such privileges would also have been

23   vitiated by the crime-fraud exception.  See, e.g., In re Grand Jury

24   Investigation, 810 F.3d 1110, 1113 (9th Cir. 2016).  And under the

25   first step of the two-step procedure established by United States v.

26

27   _____

28       [1] Defendants have emphasized repeatedly to the government that
     Sussman's Email was attorney work product but was not an attorney-
     client communication.

                                    2

1  *Zolin*, the government believes it has established a "factual basis

2  adequate to support a good faith belief by a reasonable person that

3  *in camera* review of [Sussman's Email and Sussman's Memo] may reveal

4  evidence to establish the claim that the crime-fraud exception

5  applies." 491 U.S. 554, 572 (1989); *see also* *United States v.*

6  *Christensen*, 828 F.3d 763, 800 (9th Cir. 2015).

7          Accordingly, if the Court rules that Sussman's Email is

8  otherwise privileged, the government's prosecution team also requests

9  that the Court agree to review, in a subsequent filing submitted by

10  the privilege-review team, an unredacted version of Sussman's Email

11  to determine whether the crime-fraud exception applies.[2]  The

12  government likewise requests an order directing defendant FAT Brands

13  to produce to the Court for *in-camera* review an unredacted version of

14  Sussman's Memo for the same purpose.[3]

15  **II.    STATEMENT OF RELEVANT FACTS AND IDENTIFIED COMMUNICATIONS**

16          As noted and alleged, and among other schemes and crimes,

17  Wiederhorn caused FAT to compensate him to the tune of roughly $47

18  million in undisclosed income, which Wiederhorn and his codefendants

19  fraudulently categorized as loans from both FAT and its affiliate,

20  Fog Cutter Capital Group Inc. ("FOG").  (*See, e.g.*, Dkt. No. 1

21

22

23          [2] As exemplified by Exhibits A and B to the Schleifer

24  Declaration, there were various email offshoots relating to this
    topic between FAT's outside auditors, Wiederhorn, Sussman,

25  Hershinger, and others; the government requests that the Court order
    FAT to produce such offshoots for purposes of the Court's *Zolin*

26  review.

          [3] Whereas FAT's auditors have produced unredacted versions of

27  Sussman's Email to the government, the government does not similarly
    have an unredacted version of Sussman's Memo.  Nor, as noted *supra*,

28  does the government possess unredacted versions of offshoots of
    Sussman's Email, although FAT does possess such versions.

("Indictment") ¶¶ 1-2.)[4]  By mischaracterizing these illegal distributions as "loans," Wiederhorn was able to mislead the IRS as to his financial picture and avoid preexisting tax debts as well as additional assessments of income tax.  (Id. at ¶¶ 35-42, 52-80.)

Although Wiederhorn; FAT's CFO, Rebecca D. Hershinger ("Hershinger"); and FAT itself often retroactively classified distributions to Wiederhorn as "loans" and "intercompany transfers" from FAT to FOG, in reality Wiederhorn often simply caused FAT to pay his credit card and other bills and wire additional funds directly to him.  (See, e.g., Indictment ¶¶ 55-66.)  As set forth below, those and related transactions eventually drew the scrutiny of FAT's outside auditors, and Wiederhorn's and Hershinger's material misstatements and omissions to FAT's auditors predicate Counts Eighteen through Twenty of the Indictment in this case.  (Id. ¶¶ 131-32.)

**A.    Sussman's March 12, 2020, Email to Outside Auditors**

In February and March 2020, FAT's outside auditors began to scrutinize some of the suspicious transactions constituting the scheme.  (Id. ¶¶ 84-92.)  In response, Wiederhorn misled them, as evidenced by the first email in the chain containing Sussman's Email, an auditor's March 6, 2020, email to Wiederhorn, which summarized their oral discussion and Wiederhorn's "interpretation" "that the loans are allowable if they are to [FOG] and not you, personally." (Schleifer Decl. Ex. A. at 4.)  Given the apparent risks of self-

---

[4] Wiederhorn's scheme in this regard was an outgrowth and continuation of similar conduct he undertook in connection with FOG's predecessors in the 1990s when he took and forgave some $65 million in prior loans, which conduct culminated in his pleas of guilty to two felonies in 2004.  (Id. ¶¶ 25-32.)

dealing and the fact that "[r]elated party disclosures are a hot
button focus issue for the SEC and the PCAOB," however, the auditors
requested "more details" and "anything we can get" from FAT's then-
outside counsel, Allen Sussman, "in writing to support" Wiederhorn's
representations that the funds flowing to him were permissible and
that "the loans" were <u>not</u> flowing to him "personally." (See <u>id.</u>)

The next day, Wiederhorn forwarded the auditor's email to
Sussman. (Schleifer Decl. Ex. B.)  The following week, Sussman
emailed the requested analysis directly to FAT's outside auditor, who
then forwarded the same to Hershinger.[5]  (Schleifer Decl. Ex. A at 1–
3.)

### B.   Sussman's April 24, 2020, Emailed Memo

Some six weeks later, on April 24, 2020, Sussman also emailed
Wiederhorn a "Memo to the Board," which Wiederhorn forwarded onward
to FAT's directors that same day. (Schleifer Decl. Ex. C.)  Four
days later, on April 28, 2020, Wiederhorn sent FAT's directors an "e-
mail to supplement [Sussman's] memo . . . re: the Intercompany Loan."
(<u>Id.</u>; <u>see also</u> Indictment ¶ 95.)  In that "supplement," Wiederhorn
asserted,

> I have navigated the cashflow of both FAT and FOG through
> these difficult three years carefully keeping in mind the
> best interests of all FAT shareholders as well as FOG
> shareholders.  It does no good to create a situation where
> FOG is put at risk with its existing creditors, hence
> putting the NOL[6] at risk.

---

[5] The email's subject is "SOX 402 Question."  In relevant part,
Section 402 of the Sarbanes-Oxley Act, 15 U.S.C. § 78m(k)(1),
provides, "[i]t shall be unlawful for any issuer . . . directly or
indirectly, including through any subsidiary, to extend or maintain
credit, to arrange for the extension of credit, or to renew an
extension of credit, in the form of a personal loan to or for any
director or executive officer.  Counts Sixteen and Seventeen of the
Indictment in this case allege criminal violations of that law.

[6] Net operating losses.

5

1 (Id.)  Wiederhorn also misrepresented, "[f]unds at FOG are used to

2 pay pre-existing pre-IPO liabilities" and enumerated seven specific

3 liabilities with associated monthly payment requirements.  (Id.)

4 Wiederhorn did not disclose, however, that he would route a majority

5 of the funds to be loaned from FAT to FOG to himself, and neither did

6 Hershinger or Sussman, both of whom were copied on this email and

7 attended multiple board meetings at which these matters were

8 otherwise discussed in depth.

9      **C.  Sussman's Communications Furthered Schemes**

10      In these ways, the advice sought and given by Sussman in March

11 and April 2020 lie at the center of the frauds and related crimes

12 alleged in the government's case, and likewise predicated and

13 preceded the outflow of an additional $8 million from FAT to

14 Wiederhorn in the fraudulent form of loans in the second, third, and

15 fourth quarters of 2020.  (See Indictment ¶¶ 95-102, 128, 130, 132,

16 134.)

17 **III. Argument**

18      **A.  Legal Standards**

19           1.  <u>Attorney-Client Privilege</u>

20      "The attorney-client privilege protects confidential disclosures

21 made by a client to an attorney to obtain legal advice as well as an

22 attorney's advice in response to such disclosures.  The purpose of

23 the attorney-client privilege is to encourage full and frank

24 communication between attorneys and their clients . . . ."

25 <u>Christensen</u>, 828 F.3d. at 802 (cleaned up).  Not all communications

26 involving counsel are privileged, however, and "[b]ecause it impedes

27 full and free discovery of the truth, the attorney-client privilege

28 is strictly construed."  <u>Ruehle</u>, 583 F.3d at 607.  The traditional

eight-part test to determine "whether information is covered by the attorney-client privilege" is as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

Id.

### 2.   Work-Product Doctrine

The work product doctrine protects from discovery "documents and tangible things prepared by his party or his representative in anticipation of litigation," and "[a]t its core . . . shelters the mental processes of the attorney" so that the attorney "can analyze and prepare his client's case." Christensen, 828 F.3d. at 805 (internal quotation marks and citations omitted).  The "prepared in anticipation of trial" requirement of the work-product doctrine reduces to the question whether "it can fairly be said that the document was created because of anticipated litgation, and would not have been created in substantially similar form but for the prospect of that litigation."  Eastman, 594 F. Supp. 3d at 1182 (internal quotation marks omitted; emphases in original).

Although the work-product doctrine is written into Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, it has long been applied as well to protect the mental processes of attorneys in connection with criminal representation as well.  E.g., United States v. Nobles, 422 U.S. 225, 238 (1975).  That said, "[t]he privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived."  Id. at 239.

7

1          3.   Crime-Fraud Exception

2      "[W]hen a client consults an attorney for legal assistance to

3 carry out a contemplated or ongoing crime," all "reasons for the

4 [attorney-client] privilege are eviscerated." In Re Grand Jury

5 Proceedings, 867 F.2d 539, 541 (9th Cir. 1989).  Put another way,

6 "the attorney-client privilege does not extend to communications

7 between attorney and client where the purpose of that communication

8 is to further . . . illegality." United States v. Friedman, 445 F.2d

9 1076, 1086 (9th Cir. 1971).  That is because "[t]he purpose of the

10 work product privilege is to protect the integrity of the adversary

11 process"; "it does not apply to foster a distortion of the adversary

12 process by protecting illegal" or even unethical actions by an

13 attorney.  Id. (internal quotation marks and citations omitted).

14      As the above holdings suggest, the crime-fraud exception applies

15 equally to documents otherwise privileged as either attorney-client-

16 communications or attorney work-product.  See, e.g., Christensen, 828

17 F.3d. at 802 (analyzing and applying crime-fraud exception to both).

18      The crime-fraud exception also "applies even when an attorney is

19 unaware that the client is engaged in or planning a crime." In re

20 Grand Jury Investigation, 445 F.3d 266, 279 n.4 (3rd Cir. 2006); see

21 also In re Grand Jury Proceedings, 87 F.3d 377, 382 (9th Cir. 1996)

22 ("It is therefore irrelevant, for purposes of determining whether the

23 communications here were made 'in furtherance of' Corporation's

24 criminal activity, that [counsel] may have been in the dark about the

25 details of that activity.").

26          4.   Zolin Process

27      Zolin established a two-step ex-parte process to evaluate

28 "whether the crime-fraud exception applies to potentially privileged

materials." <u>Christensen</u>, 828 F.3d at 799.  First, a court must
determine whether there is a '"showing of a factual basis adequate to
support a good faith belief by a reasonable person that <u>in camera</u>
review of the materials may reveal evidence to establish the claim
that the crime-fraud exception applies.'" <u>Id.</u> (quoting <u>Zolin</u>, 491 at
572).  "Second, if the government makes such a preliminary showing
based on evidence other than the potentially privileged materials
themselves, the court may conduct an <u>in camera</u> review to determine
whether the materials are privileged and, if so, whether the crime-
fraud exception applies." <u>Id.</u>

**B.  Sussman's Email to Outside Auditors Was Never Privileged**

Sussman's Email was never privileged because it was never
created because of anticipated litigation and because it was never
confidential.

First, Sussman's Email was never privileged under the work-
product doctrine because it was never drafted or sent for any
litigative purpose; it was drafted and sent instead to "support
financial filings and gain auditor approval." <u>United States v.
Textron Inc. & Subsidiaries</u>, 577 F.3d 21, 31-32 (1st Cir. 2009);
<u>Santander Holdings USA, Inc. & Subsidiaries v. United States</u>, 2012 WL
3218535, at *1 (D. Mass. Aug. 6, 2012) (tax-reserve work papers not
privileged because "they are prepared primarily to fulfill accounting
and reporting requirements and not in anticipation of litigation,
even though they assess potential litigation").  This Court's holding
in <u>Eastman</u>, 594 F.Supp. 3d at 582, is also instructive in this
regard.  Noting that the work-product doctrine applies a '"because
of"' and "<u>but for</u>" test, which asks whether "it can fairly be said
that the document was created <u>because of</u> anticipated litigation,"

1  Eastman held that many of the documents claimed as privileged in that
2  case were not privileged because they were not created because of
3  anticipated litigation.  Id. at 582-84.  Here, Sussman's Email was
4  not created because of litigation; it was created because FAT's
5  outside auditor requested reassurance that FAT's (fraudulent)
6  transactions were appropriate under SOX 402 and other relevant law.

7      Second, Sussman's Email was never communicated in confidence for
8  purposes of either the work-product doctrine or the attorney-client-
9  privilege, because it was created at the request of FAT's outside
10 auditors and sent to them, for their consumption and analysis, in the
11 first instance.  E.g., Ruehle, 583 F.3d at 607-609 (holding, "Ruehle
12 fails the fourth element of the traditional eight-part privilege
13 test" because "Ruehle's statements to . . . attorneys were not 'made
14 in confidence' but rather for the purpose of disclosure to the
15 outside auditors.")

16     Accordingly, and even before analyzing the question whether any
17 privilege over Sussman's Email was waived through disclosure to the
18 outside auditors or due to its role in a crime-fraud, this Court can
19 and should hold that Sussman's Email was never privileged in the
20 first place.

21     **C.  Any Privilege Over Sussman's Email Was Waived**

22     For similar reasons, even were Sussman's Email privileged in the
23 first instance, the disclosure by Sussman's client, FAT, to its
24 outside auditors would have operated as a waiver.  Numerous courts
25 have held that "disclosure of privileged communications to outside
26 auditors waives both attorney-client privilege and the work-product
27 protection."  E.g., First Horizon Nat'l Corp. v. Houston Cas. Co.,
28 2016 WL 5867268, at *10 (W.D. Tenn. Oct. 5, 2016).  And that is

because, '"[b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility,'" and '"owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust,'" rather than alignment and confidentiality with the client.  <u>Medinol</u>, 214 F.R.D at 116 (quoting <u>United States v. Arthur Young & Co.</u>, 465 U.S. 805, 817–18 (1984)); <u>see also</u> <u>United States v. Hatfield</u>, 2010 WL 183522, at *3 (E.D.N.Y. Jan. 8, 2010) (disclosure to outside auditors waived work-product protection).[7]

D.      **The Government Has Satisfied <u>Zolin</u>'s First Step**

The non-privileged evidence available to the Court in both email chains containing Sussman's Email and Sussman's Memo suffices to support <u>Zolin</u>'s minimal threshold at the first step that there is a "good faith belief by a reasonable person that <u>in camera</u> review of the [privileged] materials may reveal evidence to establish the claim that the crime-fraud exception applies."  <u>Zolin</u>, 491 U.S. at 572.

The detailed requests by FAT's outside auditor, which predicated Sussman's response to them, establish a good-faith basis to believe

---

[7] <u>United States v. Sanmina Corp.</u>, 968 F.3d 1107, 1122 (9th Cir. 2020), is not to the contrary.  Although <u>Sanmina</u> noted that "disclosure of work product to a third party does not waive the protection unless such disclosure is made to an adversary" or "has substantially increased the opportunities for potential adversaries to obtain the information," it held that a client's production of memoranda to its outside law firm for purposes of issuing a valuation report was a waiver of attorney-client communications but was not a waiver of work-product protection before holding also that providing a memo to the IRS referencing those memoranda <u>was</u> a partial waiver of work-product protection.  <u>Id.</u> at 1121–26.

1  that review of the substance of Sussman's "may reveal evidence" that

2  Sussman's advice was sought and provided in furtherance of a crime

3  and fraud, whether or not Sussman was a knowing participant in the

4  same. <u>Id</u>.

5      The same is true regarding Sussman's Memo to FAT's Board one

6  month later.  In a misrepresentation critical to his fraud scheme,

7  Wiederhorn specifically described those misrepresentations as a

8  "supplement" to Sussman's "memo to the board re: the Intercompany

9  Loan." (Schleifer Decl. Ex. C at 1.)  In other words, Wiedhorn's own

10  words establish a good-faith basis to believe that the substance of

11  Sussman's Memo to FAT's Board "may reveal evidence," that Sussman's

12  advice was sought and given in furtherance of multiple frauds and

13  crimes. <u>Zolin</u>, 491 U.S. at 572.

14      For these reasons, if the Court believes Sussman's Email is

15  otherwise privileged, the Court should direct that the government's

16  privilege-review team provide an unredacted version of the same to

17  the Court for purposes of its own <u>ex-parte in-camera</u> review under

18  <u>Zolin</u>'s second step.  The Court should also direct defendants to

19  furnish the Court with unredacted versions of the offshoots of

20  Susman's Email (<u>see, e.g.</u>, Schleifer Decl. Ex. B) as well as of

21  Sussman's Memo (<u>id.</u> Ex. C) so that the Court may conduct an <u>in-camera</u>

22  review of the unredacted versions of these communications under

23  <u>Zolin</u>'s second step.[8]

24

25

26

_____

27      [8] <u>See</u> Notes 2-3, <u>supra</u>.  In addition to the emails exhibited to
the Schleifer Declaration, there is, for, example, another email from
28  Wiederhorn to Sussman on March 13, 2020, produced in redacted form to
the government at FATBRANDS_00459319.

**IV.    CONCLUSION**

      For the foregoing reasons, the government respectfully requests that this Court hold that Sussman's Email was never privileged or, alternatively, that any such privilege has been waived. Alternatively, the government requests that the Court direct the government's privilege-review team and FAT to furnish the Court with the relevant unredacted versions of Sussman's Email and related communications so that it may conduct an <u>in-camera</u> review of the same.

      The government further requests that the Court direct defendant FAT to furnish the Court with an unredacted version of Sussman's Memo so that the Court may conduct an <u>in-camera</u> review of that communication as well.

13