GIBSON, DUNN & CRUTCHER LLP
DOUGLAS FUCHS, SBN 196371
  DFuchs@gibsondunn.com
NICOLA HANNA, SBN 130694
  NHanna@gibsondunn.com
JIMMY ROTSTEIN, SBN 305072
  JRotstein@gibsondunn.com
RAYCHEL TEASDALE, SBN 335034
  RTeasdale@gibsondunn.com
BRENNA GIBBS, SBN 342388
  BGibbs@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071
Telephone:  213.229.7000
Facsimile:   213.229.7520

*Attorneys for Defendant*
*Andrew A. Wiederhorn*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      v.<br><br>ANDREW A. WIEDERHORN, WILLIAM J. AMON, REBECCA D. HERSHINGER, AND FAT BRANDS INC.,<br><br>            Defendants. | CASE NO. 2:24-CR-00295-RGK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. WIEDERHORN'S MOTION TO COMPEL THE PRODUCTION OF OUTSTANDING DISCOVERY**<br><br>**Trial**: October 28, 2025<br>**Hearing Date**: May 12, 2025<br>**Hearing Time**: 10:00 a.m.<br>**Dept**: Courtroom 850, 8th Floor<br>**Judge**: Honorable R. Gary Klausner |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 4
    A.    The 1990s Loans ................................................................................ 4
    B.    Over 20 Years Ago, The Government Determined It Could Not Bring Charges Related To The 1990s Loans .......................................... 5
    C.    Mr. Wiederhorn Pled Guilty To Charges Unrelated To The 1990s Loans .................................................................................................. 6
    D.    Mr. Wiederhorn Establishes A Successful Restaurant Business .............. 6
    E.    The Government Indicts Mr. Wiederhorn.............................................. 7
    F.    The Government Claims It Will Introduce Evidence About The 1990s Loans At Trial, But Has Failed To Produce The Complete Set Of Discovery Relating To The Prior Investigation ............................ 8

LEGAL STANDARD ........................................................................................... 10

ARGUMENT ....................................................................................................... 11
    A.    The Court Should Compel The Immediate Production Of All Outstanding 1990s Loans Discovery ................................................... 12
        1.    The 1990s Loans Discovery Must Be Produced Under *Brady*...... 12
        2.    The 1990s Loans Discovery Must Be Produced Pursuant To Rule 16 ...................................................................................... 14
    B.    The Court Should Compel The Government To Provide Information Detailing The Destruction Of Any 1990s Loans Discovery ......................................................................................... 15

CONCLUSION.................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Brady v. Maryland*,
   373 U.S. 83 (1963) ................................................................................................ 10

*Giglio v. United States*,
   405 U.S. 150 (1972) .............................................................................................. 10

*United States v. Alahmedalabdaloklah*,
   94 F.4th 782 (9th Cir. 2024) ................................................................................ 12

*United States v. Bagley*,
   473 U.S. 667 (1985) .............................................................................................. 10

*United States v. Balwani*,
   2022 WL 1720081 (N.D. Cal. May 27, 2022) ..................................................... 16

*United States v. Blanco*,
   392 F.3d 382 (9th Cir. 2004) ................................................................................ 12

*United States v. Budziak*,
   697 F.3d 1105 (9th Cir. 2012) .............................................................................. 11

*United States v. Bundy*,
   968 F.3d 1019 (9th Cir. 2020) .............................................................................. 10

*United States v. Cloud*,
   102 F.4th 968 (9th Cir. 2024) .............................................................................. 12

*United States v. Doe*,
   705 F.3d 1134 (9th Cir. 2013) ........................................................................ 11, 15

*United States v. Howell*,
   231 F.3d 615 (9th Cir. 2000) ................................................................................ 16

*United States v. Jefferson*,
   2025 WL 53338 (W.D. Wash. Jan. 8, 2025) ................................................... 12, 16

*United States v. Olsen*,
   704 F.3d 1172 (9th Cir. 2013) ....................................................................... 3, 12, 13

*United States v. Saffarinia*,
   424 F. Supp. 3d 46 (D.D.C. 2020) ....................................................................... 14

Gibson, Dunn & Crutcher LLP

*United States v. Sager*,
    227 F.3d 1138 (9th Cir. 2000) ................................................................. 16

*United States v. Shetty*,
    2024 WL 4979830 (W.D. Wash. Dec. 4, 2024) .............................. 12, 14

*United States v. Soto-Zuniga*,
    837 F.3d 992 (9th Cir. 2016) ........................................................... 14, 15

*United States v. Stever*,
    603 F.3d 747 (9th Cir. 2010) ................................................................. 11

*United States v. Sudikoff*,
    36 F. Supp. 2d 1196 (C.D. Cal. 1999) .................................................. 10

*United States v. Triumph Capital Grp., Inc.*,
    544 F.3d 149 (2d Cir. 2008)……………………………………...…14

**Rules**

Fed. R. Crim. P. 16 ...................................................... 3, 4, 11, 14, 15

# INTRODUCTION

The heart of the government's case relates to two distinct lines of credit extended by Defendant Andrew Wiederhorn's closely-held company, Fog Cutter Capital Group Inc. ("Fog Cutter"), to Mr. Wiederhorn—one in 2010 that was forgiven in 2017, and a second in 2018 that was forgiven in 2020.  However, the government is determined to expand the trial in this case well beyond this ten-year period by dragging in unrelated loans from over 20 years ago—loans Mr. Wiederhorn received from a *different* company and that involved entirely *different* circumstances ("the 1990s loans").  The 1990s loans are irrelevant to this case, highly prejudicial, will confuse the jury, and will significantly extend the length of the trial.  At the appropriate time, Mr. Wiederhorn will move to exclude the 1990s loans; however, given the government's desire to inject the 1990s loans into this case as allegedly part of the same overall scheme charged, Mr. Wiederhorn brings this motion to compel the production of all the information regarding the 1990s loans in the government's possession, custody, or control.

Significantly, in the early 2000s, the government investigated the 1990s loans, gathered a massive amount of information concerning those loans, and concluded that Mr. Wiederhorn *could not be charged* with any crime related to them.  Incredibly, despite its stated intention to introduce evidence concerning the 1990s loans at trial in this case, the government has failed to produce this information to Mr. Wiederhorn— the very information that caused the government to conclude in the early 2000s that Mr. Wiederhorn's conduct regarding the 1990s loans was *not* criminal.

Accordingly, Mr. Wiederhorn brings this motion to compel the government to produce all of the information regarding the 1990s loans that it previously collected.  To the extent this exculpatory and material discovery was destroyed or is no longer in the government's possession, Mr. Wiederhorn requests that the Court order the government to provide details of the document destruction.

\*\*\*

In the early 2000s, the U.S. Attorney's Office in Oregon (where Mr. Wiederhorn

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES

then-lived) investigated Capital Consultants, Inc. ("CCI"), a prominent Oregon investment firm that managed pension funds, and its principal Jeffrey Grayson, in the wake of the 1998 financial crisis and resulting business failures in the community. The investigation was wide-ranging and examined various dealings between Mr. Grayson or CCI and various individuals, including Mr. Wiederhorn. The government then expanded its investigation to include the 1990s loans.

After obtaining hundreds of thousands of pages of documents produced by Arthur Anderson and other professionals who analyzed the 1990s loans and prepared Mr. Wiederhorn's tax returns, the government determined it could *not* charge Mr. Wiederhorn with any crime regarding the 1990s loans. *See* Declaration of Douglas Fuchs ("Decl.") ¶ 2, Exs. 1, 2.

In the early 2000s, although the government concluded it could not charge Mr. Wiederhorn for the 1990s loans, it pursued other, unrelated charges. But the government also had serious concerns about those charges. Nonetheless, the DOJ official in Washington, D.C., who was assigned responsibility for the investigation after the Portland U.S. Attorney recused herself, authorized a rare, if not unprecedented, mediation to resolve the matter. As a result of this mediation, Mr. Wiederhorn ultimately pled guilty to two charges which had nothing to do with the 1990s loans.

First, Mr. Wiederhorn pled to a violation of 18 U.S.C. § 1954, which prohibits providing something of value to an ERISA plan manager regardless of whether a defendant acts with corrupt intent. Mr. Wiederhorn released Mr. Grayson (an ERISA plan manager) from a personal loan guarantee, although both the government and the court recognized Mr. Wiederhorn only did so based on advice of counsel. Dkt. 105-5 at 9. Second, Mr. Wiederhorn pled to filing a false tax return in violation of 26 U.S.C. § 7206(1), based on a discrete transaction in which he sold an asset to an acquaintance that the government contended did not generate a true capital loss on his return. However, the government acknowledged that the IRS did not suffer any loss. *Id.* at 5.

Though these offenses had nothing to do with the 1990s loans, which the

government had already concluded could not be prosecuted, the government plans to tell a different story to the jury here—that Mr. Wiederhorn's tax treatment of the 1990s loans was criminal and somehow connected to the Fog Cutter lines of credit, which came nearly 20 years later. The government has claimed the 1990s loans are either (1) part of the same "scheme" as the Fog Cutter lines of credit, (2) "inextricably intertwined" with the Fog Cutter lines of credit, and/or (3) admissible as "prior bad acts" under Rule 404(b)—and that from this menu, the government can tell the jury that Mr. Wiederhorn engaged in criminal conduct by failing to report the 1990s loans as taxable income.

The government's effort to inject the 1990s loans into this case is improper. These decades-old loans are entirely irrelevant to the Fog Cutter lines of credit at issue in this case, would confuse the jury, and would create an additional trial within a trial as to the legality of the 1990s loans. And although the government tries to disguise it, the government is really trying to introduce impermissible character evidence (*i.e.,* propensity to engage in specific conduct) in violation of Fed. R. Evid. 404(a)(1). The 1990s loans should not be admitted at trial and Mr. Wiederhorn will move to exclude any mention of the 1990s loans at the appropriate time.

But because the government seeks to introduce evidence about the 1990s loans, Mr. Wiederhorn, at a minimum, is entitled to all discovery regarding the 1990s loans in the government's possession, custody, or control, including evidence and files provided to the Oregon USAO, Main Justice in D.C., DOJ Tax, the FBI, and the IRS (the "1990s loans discovery"). Despite Mr. Wiederhorn's detailed and repeated requests, the government has produced almost *none* of these documents and has refused to provide a cogent reason why. The files of each of these arms of government must be searched, and these documents must be produced under both *Brady* and Rule 16.

**The evidence is exculpatory under *Brady*.** Under *Brady*, evidence must be produced to the defense if it is "potentially" exculpatory. *United States v. Olsen*, 704 F.3d 1172, 1181 (9th Cir. 2013). The evidence the government refuses to produce indisputably meets this standard, as it is the same evidence that led the government to

conclude in the early 2000s that Mr. Wiederhorn could *not* be charged with a crime related to the 1990s loans.  For example, the government reported it received hundreds of thousands of pages of documents from Arthur Andersen regarding the loans.  Decl., ¶ 5, Ex. 7.  Ultimately, Arthur Andersen drafted and signed off on Mr. Wiederhorn's tax returns, which reported that the 1990s loans were not taxable income.  Thus, the Arthur Andersen documents will provide analysis supporting its conclusion and demonstrating why Mr. Wiederhorn's tax position was proper.

**The evidence is material under Rule 16.**  Separately, the 1990s loans discovery must be produced under the broad disclosure provisions of Rule 16.  The government claims the 1990s loans are part of the overall scheme charged.  If the government insists on introducing the 1990s loans in this case and arguing they were improper, then Mr. Wiederhorn is entitled to review all documents relating to those loans—regardless of their exculpatory value—so he can prepare his defense.

## FACTUAL BACKGROUND

### A. The 1990s Loans

In the 1990s, Mr. Wiederhorn owned several entities involved in the financial services industry (collectively the "Wilshire companies").  During that time period, the Wilshire companies loaned Mr. Wiederhorn money—the 1990s loans the government seeks to inject into this case.  Both of the tax advisors Mr. Wiederhorn used at the time— Deloitte & Touche and Arthur Andersen—determined the 1990s loans were bona fide loans (*i.e.*, not income) and thus reported them as debt on Mr. Wiederhorn's tax returns.

Mr. Wiederhorn intended to repay the balance by selling his Wilshire stock.  But that became impossible when an international economic crisis destroyed Wilshire's business.  Wilshire was forced into bankruptcy and negotiated a bankruptcy plan.  As part of the bankruptcy plan, Mr. Wiederhorn's equity ownership in Wilshire was wiped out and his debt to the company was forgiven.

In 1998, Arthur Andersen determined Mr. Wiederhorn was insolvent—largely because his primary asset, his Wilshire stock, was worthless.  Arthur Andersen prepared

tax returns that disclosed to the IRS that (1) the Wilshire companies forgave Mr. Wiederhorn's debt, and (2) the forgiveness did not trigger income tax liability for Mr. Wiederhorn because of his insolvency.

### B. Over 20 Years Ago, The Government Determined It Could Not Bring Charges Related To The 1990s Loans

In 2000, the Oregon USAO opened an investigation into Jeffrey Grayson. Mr. Grayson's company, CCI, managed pension funds, and the government suspected Mr. Grayson was fraudulently manipulating fund assets.

The government's investigation into Mr. Grayson and CCI initially did not involve Mr. Wiederhorn, who played no part in CCI's scheme the government was investigating. But the investigation expanded into Mr. Grayson's other business dealings, and because Mr. Grayson had lent funds to the Wilshire companies, the government investigated Mr. Wiederhorn.

By 2003, the government's investigation expanded further to include the tax treatment of the 1990s loans, which had nothing to do with Mr. Grayson. The investigation involved the Oregon USAO, Main Justice, DOJ Tax, the IRS, and the FBI.

Ultimately, the DOJ determined there was insufficient evidence to prosecute Mr. Wiederhorn for the 1990s loans because they could not prove Mr. Wiederhorn had the requisite criminal intent. *Id.* ¶ 2, Exs. 1, 2. The IRS also conducted a civil audit and concluded there was "no fraud" concerning the 1990s loans and that not even *civil penalties* were appropriate because of Arthur Andersen's involvement in preparing Mr. Wiederhorn's tax returns. *Id.*, Ex. 3.

In connection with the investigation, the government subpoenaed *hundreds of thousands* of pages of documents from Mr. Wiederhorn, Arthur Andersen, and the Wilshire companies. *See e.g. id.* ¶ 5, Ex. 7. None of these subpoenaed materials have been produced in this case. *Id.*

### C. Mr. Wiederhorn Pled Guilty To Charges Unrelated To The 1990s Loans

Although the government concluded it could not take action against Mr.

Wiederhorn concerning the 1990s loans, it pursued other unrelated charges. But it had serious concerns about those charges as well. Nonetheless, Mr. Wiederhorn and the DOJ agreed to the highly unusual step of conducting a mediation before a sitting federal district judge in Oregon. As a result of the mediation, Mr. Wiederhorn agreed to plead guilty to the two charges described above, which were completely unrelated to the 1990s loans. *See supra* at 2; *see also* Dkt. 105-5.

### D. Mr. Wiederhorn Establishes A Successful Restaurant Business

Starting in 2005, Mr. Wiederhorn focused on rebuilding his life and growing his company Fog Cutter, which acquired and franchised restaurant brands. In 2010, Fog Cutter extended a line of credit to Mr. Wiederhorn pursuant to a promissory note. In 2016, Mr. Wiederhorn hired Andersen Tax to prepare Fog Cutter's tax returns and his personal tax returns. As part of this engagement, Andersen Tax provided advice on how to resolve the line of credit. Importantly, the line of credit extended by Fog Cutter is entirely unrelated to the 1990s loans—the Fog Cutter line of credit was extended nearly 20 years later by a different company, pursuant to a different agreement, was resolved in different circumstances, and was analyzed by a different tax advisor (Andersen Tax is a different firm than Arthur Andersen).

In 2016, Andersen Tax advised Mr. Wiederhorn that Internal Revenue Code §108 insolvency was a potential option to resolve the line of credit from Fog Cutter, a common and legal tax deferral strategy used by tens of thousands of taxpayers every year.[1] Under section 108, Fog Cutter could forgive the debt and take a capital loss, while Mr. Wiederhorn would not have to pay income tax immediately on the forgiven loan. On his 2017 tax return, Mr. Wiederhorn followed Andersen Tax's advice and transparently disclosed to the IRS the amount of credit Fog Cutter had extended, the forgiveness of that debt, his insolvency, and that he was relying on IRC §108.

---

[1] Under 26 U.S.C. §§ 108(a)(1)(B) and 108(a)(3), a loan forgiveness is excluded from gross income on a taxpayer's tax return when a taxpayer is insolvent, which occurs when the taxpayer's liabilities are greater than his or her assets. Under 26. U.S.C. §§ 108(b) and 1017, taxes on the forgiven loan can be deferred.

In late 2017, Fog Cutter transferred its restaurant brand assets to a newly created entity, FAT Brands Inc. ("FAT"), in connection with FAT's initial public offering ("IPO"). Mr. Wiederhorn served as the CEO of FAT, which was 80% owned by Fog Cutter, Mr. Wiederhorn's private company. The 2010 loan was forgiven in 2017, prior to FAT's IPO. After the IPO, Fog Cutter extended a new line of credit to Mr. Wiederhorn effective as of January 1, 2018.

In 2020, as part of a long-standing plan to simplify FAT's ownership structure and raise capital, Fog Cutter merged with FAT. Under Section 402 of the Sarbanes-Oxley Act, a public company cannot extend credit to its executives—so as a result of the merger, Fog Cutter terminated the line of credit to Mr. Wiederhorn and forgave his debt. Andersen Tax reviewed the line of credit and information regarding Mr. Wiederhorn's finances, and again determined Mr. Wiederhorn could utilize IRC §108. Just like in 2017, Mr. Wiederhorn's 2020 tax return transparently disclosed to the IRS the amount of credit Fog Cutter had extended, the forgiveness of that debt, his insolvency, and reliance on IRC §108.

### E. The Government Indicts Mr. Wiederhorn

On May 9, 2024, the government indicted Mr. Wiederhorn and three co-defendants in this action. The 22-count indictment alleges that the lines of credit Fog Cutter extended to Mr. Wiederhorn from "2010" to "January 2021" were a "sham," and should have been treated as "taxable income." Dkt. 1 ¶¶ 1–3. The government alleges Mr. Wiederhorn and his co-defendants concealed the true nature of the line of credit, and thereby evaded taxes and committed securities and wire fraud. *See id.* ¶¶ 103–34.

The indictment alleges that the charged conduct began in 2010. *See id.* ¶ 105(b). However, the indictment also purports to describe the 1990s loans (*see id.* ¶¶ 25–30)—even though the indictment does not allege they are part of the charged conduct.

The indictment's allegations regarding the 1990s loans are false and misleading—for example, the indictment claims Mr. Wiederhorn "forgave" the 1990s loans, when the fact is the 1990s loans were discharged in connection with a restructuring plan related

to Wilshire's bankruptcy.  *See supra* at 4.  The indictment also falsely insinuates that the 1990s loans are somehow connected to Mr. Wiederhorn's June 2004 guilty plea (*see* Dkt. 1 ¶ 31)—but his guilty pleas had nothing to do with the 1990s loans.  Most importantly, the indictment fails to mention that the government determined in the early 2000s that it could not bring charges related to the 1990s loans because it could not establish that Mr. Wiederhorn acted with intent to defraud.  *See supra* at 5.

**F. The Government Claims It Will Introduce Evidence About The 1990s Loans At Trial, But Has Failed To Produce The Complete Set Of Discovery Relating To The Prior Investigation**

On May 24, 2024, the government sent Mr. Wiederhorn a letter stating it intended to introduce the 1990s loans as prior bad acts under Rule 404(b).  Decl., ¶ 4, Ex. 5.  In later communications and court filings, the government reiterated that it intends to introduce evidence of the 1990s loans at trial, but also described the loans as not just 404(b) evidence, but also "part of the same continuing set of schemes and/or inextricably intertwined therewith."  Decl., ¶ 4, Ex. 6; Dkt. 87 at 11 (stating the 1990s loans are "part of the charged scheme" or "at a minimum, inextricably intertwined with the charges in this case").  Since May 14, 2024, Mr. Wiederhorn has made multiple requests for proper 404(b) notice, and the government repeatedly said it would provide "a more detailed discussion of the Rule 404(b) evidence" "well in advance of trial."  *Id.*, Exs. 5, 6.  No such notice has been provided.  *Id.* ¶ 4.

Despite repeatedly stating it intends to introduce evidence of the 1990s loans at trial, including as part of the overall scheme charged in the indictment, the government has only produced a few documents from the prior investigation into the 1990s loans, including some FBI 302s and IRS and Department of Labor (DOL) memoranda of investigation (MOIs) and a few grand jury subpoenas.  Decl., ¶ 5.  This is only a small fraction of the information concerning the 1990s loans that the government previously gathered in the early 2000s.  *Id.*  The government has not produced the hundreds of thousands of documents it received in response to the subpoenas or the materials used

and referenced in the government reports, 302s, and MOIs, including those from witnesses the government apparently intends to call at trial. *Id.* ¶¶ 5–6. The government has also failed to confirm whether additional witness interview memorandum exist, or whether they were destroyed. *Id.* ¶ 7.

For example, an April 13, 2001 internal FBI report states that Arthur Andersen was subpoenaed and provided 20 boxes of documents to government investigators. *Id.* ¶ 5, Ex. 7. None of those documents have been produced to Mr. Wiederhorn. *Id.* In fact, the government has not produced a single communication from Arthur Andersen, though Arthur Andersen concluded the 1990s loans were legitimate and did not generate taxable income. *Id.*

A number of reports summarizing interviews with an individual described as "Tax Advisor 1" in the indictment also reference dozens of documents the government showed the witness during the interviews but has not produced.

- A January 25, 2002 MOI with Tax Advisor 1 discusses emails between her and Mr. Wiederhorn regarding the 1990s loans, yet those have not been produced. *Id.* ¶ 6.

- Another MOI with Tax Advisor 1 discusses an Arthur Andersen memorandum documenting the chronology of the Wilshire engagement. *Id.* This, along with several other Arthur Andersen communications and documents referenced in the MOI have not been produced. *Id.*

- An April 30, 2003 MOI with Tax Advisor 1 mentions several unproduced documents, including notes taken during a meeting with Mr. Wiederhorn regarding the 1990s loan and tax reporting requirements. *Id.*

- A May 15, 2003 MOI references an unproduced Deloitte & Touche "Memorandum of Conversation" discussing the 1990s loans and repayment plan. *Id.*

- Submissions Mr. Wiederhorn's then-counsel provided to the government and a memorandum memorializing a presentation they gave to DOJ Tax also describe

1  numerous exculpatory documents provided to the government, including a

2  memorandum prepared by Tax Advisor 1, an Arthur Andersen letter analyzing

3  the loans, the results and video of a polygraph test, and thousands of pages of

4  workpapers, emails, memoranda, and other materials generated by Arthur

5  Andersen. *Id.* ¶ 8.

6      None of these exculpatory documents have been produced despite the fact the

7  government collected and relied on them in concluding that Mr. Wiederhorn lacked

8  criminal intent in connection with the 1990s loans.

9      Mr. Wiederhorn has repeatedly asked the government—in the form of itemized

10  lists—for all these documents and others relating to the investigation into the 1990s

11  loans. Decl., Exs. 4, 8, 9, 10; *see also id.* ¶ 10. During meet and confer telephone calls

12  on November 12 and December 16, 2024, government counsel stated that they asked the

13  Oregon USAO and DOJ Tax for their files and produced all available materials. *Id.* ¶¶

14  10–11. However, the government has not indicated with any certainty whether it made

15  document requests to Main Justice, the FBI, or the IRS, or whether it is withholding

16  information under a claim of privilege. *Id.* And the government has not indicated with

17  any certainty what still exists, and if material does not exist, when and why it was

18  destroyed. *Id.* ¶ 12.

19  **LEGAL STANDARD**

20      The government has a constitutional obligation under *Brady v. Maryland*, 373

21  U.S. 83 (1963), and its progeny, to disclose evidence "favorable to [the] accused." *Id.*

22  at 87; *see also United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020) (quoting

23  *United States v. Bagley*, 473 U.S. 667, 674 (1985)). Both exculpatory information and

24  potential impeachment material are "favorable" and must be disclosed. *See Bagley*, 473

25  U.S. at 676-77; *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). The government's

26  duty is not limited to admissible evidence but any information "reasonably likely to lead

27  to admissible evidence." *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1200 (C.D. Cal.

28  1999).

Rule 16 "grants criminal defendants a broad right to discovery," (*United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010)), "within the government's possession, custody, or control," (Fed. R. Crim. P. 16(a)(1)(E)).  It requires the government to turn over all documents "material to preparing the defense," i.e., "helpful to the development of a possible defense."  *United States v. Budziak*, 697 F.3d 1105, 1111 (9th Cir. 2012).  Information is material even if it "cause[s] [the defendant] to completely abandon the [] defense and take an entirely different path."  *United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013).

## ARGUMENT

The 1990s loans are ultimately not relevant to any count charged in the indictment and should not be admissible in this case.  At the appropriate time, therefore, the defense will move to exclude the 1990s loans from trial:  Allowing evidence of the 1990s loans to be admitted would create an additional trial within a trial, consuming significant resources as Mr. Wiederhorn would need to introduce evidence establishing Deloitte's and Arthur Andersen's analysis of the 1990s loans and resulting tax advice, that the 1990s loans were legitimate, the circumstances of their forgiveness, as well as evidence demonstrating that the government determined it could not establish criminal intent in connection with the 1990s loans.  Introduction of the 1990s loans would also confuse the jury as to the actual loans at issue in this case—the lines of credit Fog Cutter extended to Mr. Wiederhorn from 2010 to 2020—as the 1990s loans involved different companies, different tax advisors, different governing agreements, and entirely different circumstances than the Fog Cutter lines of credit.

Nevertheless, the government intends to introduce the 1990s loan at trial and allege they were somehow improper and part of the overall scheme alleged in the indictment.  *See* Decl., ¶ 4, Ex. 6.  As such, the government must produce all exculpatory and Rule 16 evidence concerning the 1990s loans and demonstrating that Mr. Wiederhorn reasonably relied on tax advisors and other experts when reporting the 1990s loans on his tax returns.  Simply put, the government cannot have it both ways; if

it wants to introduce evidence of decades old loans, it must produce all the decades old records related to the loans and the investigation of those loans.

**A.    The Court Should Compel The Immediate Production Of All Outstanding 1990s Loans Discovery**

**1.    The 1990s Loans Discovery Must Be Produced Under *Brady***

**a.    *Brady* Disclosure Obligations Extend To All Potentially Favorable Material Held By The Government**

During pretrial discovery, the government must disclose *potentially* exculpatory material, regardless of whether it ultimately proves to be material to the trial itself. "Evidence is favorable" under *Brady*—and must be disclosed—"so long as it is '*potentially* exculpatory or impeaching.'"  *United States v. Jefferson*, 2025 WL 53338, at *4 (W.D. Wash. Jan. 8, 2025) (quoting *Olsen*, 704 F.3d at 1181 (emphasis in original)).  While *post-trial* analysis of the suppression of *Brady* evidence requires a "materiality" analysis (i.e., whether the information was likely to change the trial result), this "materiality standard . . . should *not* be applied to *pretrial* discovery of exculpatory materials." *United States v. Cloud*, 102 F.4th 968, 979 (9th Cir. 2024) (emphasis added); *see also Jefferson*, 2025 WL 53338, at *4 ("When pretrial disclosure is sought, however, *Brady's* materiality standard has been collapsed into the favorability standard.").

The government's *Brady* discovery obligations extend to any branch of the government involved in the investigation of the 1990s loans.  As this Court has recognized, "[t]he obligation under *Brady* and *Giglio* is the obligation of the government, not merely the obligation of the prosecutor." *United States v. Blanco*, 392 F.3d 382, 393 (9th Cir. 2004); *see also* Dkt. 94.  "[I]nformation is in the prosecutor's 'possession' under *Brady*"—and must be produced—"if 'it is held by other executive branch agencies and the prosecutor has 'knowledge of and access to' the evidence.'" *United States v. Shetty*, 2024 WL 4979830, at *5 (W.D. Wash. Dec. 4, 2024) (quoting *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 844 (9th Cir. 2024)); *see also id.* ("[C]ourts have repeatedly held that federal prosecutors have access to materials held by

1 | other branches of the DOJ.").

2 |            **b.**     **The 1990s Loans Discovery Is *Brady* Material**

3 |        Here, discovery concerning the 1990s loans is unquestionably "*potentially*

4 | *exculpatory*" (*Olsen*, 704 F.3d at 1181)—indeed, the government concluded in the early

5 | 2000s that it could not charge Mr. Wiederhorn with tax fraud related to the loans *because*

6 | the information it gathered showed his tax advisors vetted the loans and signed off on

7 | the tax treatment of the loans and Mr. Wiederhorn did not act with the requisite criminal

8 | intent.  Decl., Exs. 1, 2.  The lead Oregon AUSA recounted that a government official

9 | "with final say" on the matter "thought the advice of professionals defense was too hard

10 | of a defense to overcome and the case should not be prosecuted."  *Id.*, Ex. 1.  The IRS-

11 | CI Special Agent also explained that local Oregon prosecutors "were not comfortable

12 | with pursuing the shareholder loan portion. There was also some concern over the

13 | gratuity charge, but WIEDERHORN ultimately plead to it."  *Id.*, Ex. 2.  The IRS also

14 | performed a civil review of Mr. Wiederhorn's 1999 tax return and determined that,

15 | "[f]raud can not be proven" because the "[taxpayer]'s return was prepared by Arthur

16 | Andersen who appear to have made the determination of the tax treatment of the

17 | discharge of indebtedness income."  *Id.*, Ex. 3.  The evidence Main Justice, the Oregon

18 | USAO, IRS-CI Agents, and the civil IRS team reviewed to reach these conclusions—

19 | evidence the defense would naturally use here to defeat the government's claim that the

20 | 1990's loans were illicit—is the same evidence the government has failed to produce.

21 | *See supra* at 8–10 (outlining unproduced evidence).   As explained above, the

22 | government produced a handful of government reports and submissions from Mr.

23 | Wiederhorn's attorneys referencing evidence of Mr. Wiederhorn's reliance on advisors,

24 | including 20 boxes of documents Arthur Andersen produced to the government in the

25 | early 2000s.  *Id.*  But the government has not produced any of these exculpatory

26 | materials.  *Id.*

27 |        In addition, the government must produce any notes or internal correspondence

28 | related to the three presentations Mr. Wiederhorn's then-counsel gave to the USAO,

DOJ Tax, and DOJ Criminal Division (*see supra* at 10), or any proffers and reverse proffers, because such presentations necessarily contain potentially exculpatory *Brady* information.  The purpose of these presentations was to provide exculpatory facts and put forth defenses concerning, among other things, the 1990s loans.  *See United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 161-65 (2d Cir. 2008) (ordering disclosure of proffer material with *Brady* material); *United States v. Saffarinia*, 424 F. Supp. 3d 46, 91-92 (D.D.C. 2020).  The government does not dispute that it must produce "non-attorney-work-product-protected notes or reports of presentations and proffers," and this Court agreed that the government must produce this type of discovery. Dkt. 84-2 ¶ 20; Dkt. 94 at 1 (stating "there is no dispute that the Government must produce this discovery to Defendant").

Further, the government must search for and produce anything in the possession of the various arms of the government involved in the prior investigation into the 1990s loans, including the Oregon USAO, DOJ Tax, Main Justice, the IRS, and the FBI.  *See e.g.*, *Shetty*, 2024 WL 4979830, at *5 ("[I]nformation is in the prosecutor's 'possession' under *Brady* if 'it is held by other executive branch agencies and the prosecutor has 'knowledge of and access to' the evidence.'"); *see also id.* (ordering Washington prosecutors to produce documents held by SDNY USAO); *cf.* Dkt. 94 (Court Order requiring the government to produce discovery from the SEC).

Accordingly, Mr. Wiederhorn respectfully requests that the Court order the government to immediately search for and disclose all *Brady* material in the possession of these various arms of the government.

### 2.    The 1990s Loans Discovery Must Be Produced Pursuant To Rule 16

Even if the missing evidence were not potentially exculpatory (it is), all documents relating to the 1990s loans must be produced pursuant to Rule 16.

Under Rule 16, Mr. Wiederhorn "has a right to discovery of documents that are 'material to preparing the defense.'"  *United States v. Soto-Zuniga*, 837 F.3d 992, 1003 (9th Cir. 2016) (quoting Fed. R. Crim. P. 16(a)(1)(E)).  "Materiality is a low threshold;

it is satisfied so long as the information would have helped to prepare a defense." *Id.* (cleaned up). "The test is not whether the discovery is admissible at trial, but whether the discovery may assist [the defendant] in formulating a defense, including leading to admissible evidence." *Id.*; *see also Doe*, 705 F.3d at 1151 (stating information is material even if it "cause[s] [the defendant] to completely abandon the [] defense and take an entirely different path").

Here, evidence, whether exculpatory or not, relating to the 1990s loans is material to preparing Mr. Wiederhorn's defense as long as the government insists on injecting those loans into this case. *See supra* at 3-4 (explaining exculpatory and material value of the outstanding discovery). Because the government has made clear it seeks to admit this evidence at trial and argue that the 1990s loans are "part of the same continuing set of schemes" and/or "inextricably intertwined" with the charged conduct, or Rule 404(b) evidence—or maybe all three (Decl., ¶ 4, Exs., 5, 6)—the 1990s loans discovery is material to Mr. Wiederhorn's defense and must be produced pursuant to Rule 16.

***

The government has made cursory and vague representations that it requested the 1990s loans discovery and produced all available documents. Decl., ¶ 12. However, as outlined above, major gaps exist. *See supra* at 8–10. Accordingly, the Court should order the government to perform a thorough search of: (1) the Oregon USAO; (2) Main Justice; (3) DOJ Tax; (4) the IRS; and (5) the FBI, and produce all evidence it finds.

**B.    The Court Should Compel The Government To Provide Information Detailing The Destruction Of Any 1990s Loans Discovery**

The government has suggested, but not confirmed, that it believes the unproduced material may no longer exists—*i.e.*, it has been destroyed. Decl., ¶ 12. If true, the government must provide details of the destruction.

Information that suggests government misconduct or that a government investigation was performed poorly or in bad faith is exculpatory under *Brady* and must be produced. *See United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000)

("Information which might have raised opportunities to attack the thoroughness and even good faith of the investigation constitutes exculpatory, material evidence," cleaned up). "Details of the investigatory process" might affect law enforcement's credibility "and, perhaps more importantly, the weight to be given to evidence produced by [the] investigation." *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000). Courts within the Ninth Circuit regularly hold that the government must produce "facts concerning the quality or thoroughness of the Government's investigation," (*United States v. Balwani*, 2022 WL 1720081, at *2 (N.D. Cal. May 27, 2022)), including information "regarding the failure" to "adequately investigate defense-favorable … evidence," (*Jefferson*, 2025 WL 53338, at *6).

If the government indeed destroyed the outstanding 1990s loans discovery, that fact calls into question the "thoroughness and even good faith" of the current investigation and prosecution. *Id.* It could be grounds for dismissing the indictment altogether, striking all allegations relating to the 1990s loans, or telling the jury that the government acted in bad faith by alleging that Mr. Wiederhorn's tax treatment of the 1990s loans was somehow wrongful or connected to the charged conduct, after destroying the very evidence that disproves these assertions.

Accordingly, if after a thorough search of the entities referenced above it becomes clear that any of the requested discovery no longer exists, Mr. Wiederhorn also seeks an order directing the government to provide details about the document destruction, including but not limited to: (1) what was destroyed; (2) when it was destroyed; (3) why it was destroyed; (4) who made the decision to destroy; (5) when the prosecutors in this case requested the documents; (6) what documents the prosecutors in this case requested; and (7) whether the prosecutors in this case issued a document hold once their investigation began.

## CONCLUSION

For the reasons set forth above, Mr. Wiederhorn respectfully request the Court order the production of all outstanding 1990s loans discovery within 14 days of the

Gibson, Dunn & Crutcher LLP

16

1  Court's order.  To the extent any 1990s loans discovery was destroyed or is no longer in

2  the government's possession, Mr. Wiederhorn request the Court order the government

3  to provide details of the document destruction as outlined above, within the same time

4  frame.

5

6  DATED:  April 14, 2025                              Respectfully submitted,

7                                                                      GIBSON, DUNN & CRUTCHER LLP

8

9                                                                      By: */s/ Douglas Fuchs*

10                                                                            Douglas Fuchs

11                                                                            *Attorney for Defendant*
                                                                               *Andrew A. Wiederhorn*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Andrew Wiederhorn, certifies that this brief contains 5,543 words, which complies with this Court's Standing Order.


DATED:  April 14, 2025                    By: */s/ Douglas Fuchs*
                                              Douglas Fuchs

                                              *Attorney for Defendant Andrew A. Wiederhorn*